1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  SIDNEY ROSS DEEGAN, III,                    No.  2:17-cv-0604 MCE AC P

12                      Petitioner,

13          v.                                  FINDINGS AND RECOMMENDATIONS

14  WARDEN, HIGH DESERT STATE
    PRISON,
15
                        Respondent.
16

17

18          Petitioner is a former California state prisoner proceeding pro se with an application for a

19  writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on a petition which

20  challenges petitioner's 2014 conviction for threatening a judge and criminal threats.  ECF No. 1.

21  Respondent has answered.  ECF No. 13.  Petitioner did not file a traverse.

22                                    BACKGROUND

23      I.      Proceedings In the Trial Court

24          A.  Preliminary Proceedings

25          In July 2014 petitioner was arrested for a parole violation.  CT 1-10.[1]  An amended

26  information charged him with threatening a judge and criminal threats.  CST II 44-47.[2]  The

27  ───────────────────
    [1]  "CT" refers to the Clerk's Transcript on Appeal, Lodged Doc. 1.
28  [2]  "CST" refers to the Supplemental Clerk's Transcript on Appeal, Lodged Doc. 2.

                                        1

1   information also alleged petitioner had one strike prior, a prior serious felony conviction for

2   criminal threats, and had served three prior prison terms.  Id.

3          B.  The Evidence Presented at Trial

4          The jury heard evidence of the following facts.[3]  Approximately two weeks after his arrest

5   on a parole violation, petitioner appeared in Placer County Superior Court for arraignment.  Prior

6   to the hearing, Judge Frances Kearney reviewed the charges and the petition for revocation.  The

7   petition stated that defendant was on parole for committing corporal injury on a spouse, terrorist

8   threats, and causing a fire in an inhabited building.

9          At the hearing, Judge Kearney collectively advised all the defendants present of their

10   rights.  When petitioner's case was called, Judge Kearney asked if he wanted a public defender

11   appointed to represent him.  Petitioner responded that he wanted to represent himself.  Judge

12   Kearney told him it was "usually a really bad idea" to represent oneself.  She offered to continue

13   the matter for one day to allow petitioner to "think about what [he] want[ed] to do [since he was]

14   looking at some substantial time."

15          Petitioner insisted that he wanted to resolve the case that day.  Judge Kearney explained

16   that she was not familiar with his case, but that the alleged parole violation usually carried a

17   minimum of six months in custody.  She continued: "I'm not done talking.  There is no way we

18   are going to be able to resolve the case today, so you might want to consider an appointment of

19   counsel if you cannot afford [to] hire an attorney.  If after you and the public defender talk you

20   don't like what you are hearing, then of course you could always represent yourself at that point.

21   This is a complicated matter with a lot of allegations about how you violated your parole.  I can

22   set it for a contested hearing or give you a chance to talk to the public defender."

23          Petitioner stated he was agreeable to the district attorney's resolution of the matter.  The

24   court conferred with the prosecutor, who confirmed the People were seeking 180 days in custody.

25   Petitioner explained his parole was due to terminate in November and he "want[ed] to max and

26

27   _____

[3]  This factual summary is adapted from the opinion of the California Court of Appeal, Lodged
Doc. 8 at 2-6.  The undersigned has confirmed the accuracy of the summary.  The Reporter's

28   Transcript on Appeal is found at Lodged Docs. 3 & 4.

get out of here without no papers."  He also asked the court to grant him a "<u>Cruz</u> waiver"[4] for one week so he could find someone to care for his dog.

Judge Kearney replied that she would not release defendant.  She outlined two options: petitioner could either accept appointment of the public defender and continue the matter into the next week so they could discuss his options, or he could represent himself but have the matter continued for two days so the prosecutor could confirm the proposed disposition with the parole department.

The court and petitioner then had the following exchange:

> Petitioner:  What would it take to max me out right now?
>
> The Court:  I don't know.
>
> Petitioner:  Ask them.
>
> The Court:  I'm going to put the arraignment over to Friday at 8:30.
>
> Petitioner:  First of all, this is a violation of my rights.  Arraignment should take three days after the arrest upon which my parole officer is supposed to have the report.
>
> The Court:  We're going to take a short break.

As the bailiffs approached petitioner to escort him out of the courtroom, petitioner said: "Fuck you, mother fucker.  Fuck you too, bitch.  You don't know who the fuck this is.  This is manic mother fucking high beams right here.  You know your car is going to blow up."  The judge said: "Did we get that on the record?  Further charges.  No bail."

Petitioner jumped up from his seat and had to be restrained as he made the threat and was escorted from the courtroom.  Courtroom staff testified that petitioner was disruptive throughout the hearing and was "out of . . . control" when he threatened the judge.  The bailiffs considered petitioner a safety risk.

Judge Kearney testified she was "taken aback" and "surprised" by petitioner's words because no one had ever threatened to blow up her car in her 17 years as a judge.  Although she remembered asking the court reporter if petitioner's statement had been reported, she could not

---

[4]  <u>See</u> <u>People v. Cruz</u>, 44 Cal.3d 1247, 1254 n. 5 (1988).

recall saying, "Further charges. No bail." The statements did not make sense to Judge Kearney because she is not responsible for filing charges.

After finishing the arraignment calendar, Judge Kearney retired to her chambers. Initially, Judge Kearney did not "think that much" about petitioner's threat because he was in custody. Although she was aware of petitioner's prior incarceration, she did not know the extent of his criminal record.

When Judge Kearney's bailiff suggested petitioner had access to a telephone and might have friends, she became fearful and concerned that something could happen. Judge Kearney interpreted petitioner's threat to blow up her car as a threat against her life.

Judge Kearney left the building later that day and walked alone to her car, which was parked in a secured parking lot. After she went home, the incident was only in the back of her mind as a concern. Later she spoke with Detective Addison, who told her petitioner had apologized for his statement to the judge. After their conversation, Judge Kearney felt "significantly better" because petitioner had apologized for his behavior and it was "obvious" he was having a bad day when he appeared before her.

Judge Kearney asked to be reinterviewed by her bailiff about a month after the incident. She wanted to make sure that the appropriate parties understood that she felt petitioner was having a bad day when he made the threat. In addition, she wanted to express that she did not "have strong feelings about how the case was handled, [and] that [she] was [not] asking for something."

Approximately one week prior to trial, Judge Kearney told the prosecutor and investigator that she had not been fearful when petitioner made his threat because he was in custody and she thought he was angry because she failed to grant his release request. Judge Kearney believed petitioner's apology and a restraining order would be an appropriate resolution. Going through with the trial would be worse, because it "had the potential to make people angry."

The jury heard a recorded conversation between petitioner and his mother in which they discussed the charges against him. Petitioner admitted the threat, explaining: "[T]hey were violating my rights, so I got mad and fuckin, I flew off the handle."

1    Petitioner's parole officer testified that the recommended punishment for petitioner's

2 parole violation had been 180 days.  After taking his custody credits into account, petitioner

3 would have been released from custody no later than October 10, 2014.

4    C. Outcome

5    The jury returned guilty verdicts on both counts.  Petitioner waived a jury trial on the

6 priors and admitted them.  The court granted the prosecution's motion to dismiss the three prior

7 prison term enhancements in the interest of justice.  Petitioner was sentenced to nine years in

8 prison: four years, double the middle term, for criminal threats, plus five years for the prior

9 serious felony conviction.

10  II.  State Post-Conviction Proceedings

11    Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of

12 conviction on September 13, 2016.  Lodged Doc. 8.  The California Supreme Court denied review

13 on November 30, 2016.  Lodged Doc. 10.

14    Petitioner did not seek state habeas relief.

15      STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

16    28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

17 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

25    The statute applies whenever the state court has denied a federal claim on its merits,

26 whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99

27 (2011).  State court rejection of a federal claim will be presumed to have been on the merits

28 absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed,

489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a

decision appearing to rest on federal grounds was decided on another basis)).  "The presumption

may be overcome when there is reason to think some other explanation for the state court's

decision is more likely."  Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established

Federal law," but courts may look to circuit law "to ascertain whether…the particular point in

issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64

(2013).

A state court decision is "contrary to" clearly established federal law if the decision

"contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court

was incorrect in the view of the federal habeas court; the state court decision must be objectively

unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

Pinholster, 563 U.S. 170, 180-181 (2011).  The question at this stage is whether the state court

reasonably applied clearly established federal law to the facts before it.  Id. at 181-182.  In other

words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.

Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is

confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d

724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims

summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a

state court denies a claim on the merits but without a reasoned opinion, the federal habeas court

must determine what arguments or theories may have supported the state court's decision, and

subject those arguments or theories to § 2254(d) scrutiny.  Richter, 563 U.S. at 102.

6

DISCUSSION

I.    Claim One: Insufficiency of the Evidence

     A. Petitioner's Allegations and Pertinent State Court Record

Petitioner claims that the evidence was legally insufficient to sustain his conviction for threatening a judge and criminal threats.  The evidence that was presented at trial is set forth above.  At the conclusion of the prosecution's case, the defense moved for a judgment of acquittal.  CST 53-36; RT 219-222.  The motion was denied.  CT 23; RT 226.  In this court as on appeal, petitioner urges that the evidence failed to prove his intent or Judge Kearney's fear for her own safety.

     B. The Clearly Established Federal Law

Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt.  United States v. Winship, 397 U.S. 358, 364 (1970).  In reviewing the sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1974).  If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution."  Id. at 326.  "A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  Cavazos v. Smith, 565 U.S. 1, 2 (2011).

     C. The State Court's Ruling

This claim was raised on direct appeal.  Because the California Supreme Court denied discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

The Court of Appeal ruled in relevant part as follows:

> Defendant challenges the sufficiency of the evidence to support either conviction.  He contends the trial court erred in denying his motion for acquittal based on insufficient evidence.

7

Section 1118.1 provides, in relevant part, that the trial court, at the close of evidence and prior to submission of the case to the jury, "shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

The trial court must determine, based on the evidence that exists at the time of the motion, whether the prosecution has presented sufficient evidence to submit the matter to the jury. In making this determination, the court applies the same standard as we use to determine whether sufficient evidence supports the conviction on appeal. In effect, we consider whether from the evidence including all reasonable inferences to be drawn, there is any substantial evidence of the existence of each element of the offense charged. This court views the evidence in the light most favorable to the prosecution and presumes in support of the judgment the existence of every fact the trial court could reasonably deduce from the evidence. (People v. Stevens (2007) 41 Cal.4th 182, 200; People v. Johnson (1980) 26 Cal.3d 557, 576.) On appeal, we review the court's denial of a motion for judgment of acquittal under the independent standard of review. (Stevens, at p. 200.)

**Criminal Threats**

To sustain a conviction for criminal threats, the prosecution must establish that (1) the defendant willfully threatened to commit a crime which would result in death or great bodily injury to another person; (2) the defendant made the threat with the specific intent that the statement was to be taken as a threat, even if there was no intent of actually carrying it out; (3) the threat was on its face and under the circumstances in which it was made so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat; (4) the threat actually caused the person threatened to be in sustained fear for his or her own safety; and (5) that the threatened person's fear was reasonable under the circumstances. (§ 422; People v. Toledo (2001) 26 Cal.4th 221, 227-228.)

The court also instructed the jury that "[s]omeone commits an act willfully or on purpose. In deciding whether a threat was sufficiently unequivocal, immediate, unconditional and specific . . . consider those words themselves as well as surrounding circumstances.

"Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act or intend to have someone else do it. Great bodily injury means significant or substantial physical injury. It's an injury that is greater than a minor or moderate harm. Sustained fear means fear for a period of time that is more than momentar[y], fleeting or transitory. An immediate ability to carry out the threat is not required."

8

Defendant argues there was no evidence that (1) he willfully threatened to commit a crime that would result in great bodily injury or death, (2) he had the specific intent that his statements be taken as threats, and (3) that his threat caused Judge Kearney to be in sustained fear.

The prosecution presented evidence that defendant threatened to commit a crime which would result in great bodily injury or death. However, defendant characterizes his words as simply "frustration in a fit of pique" and "mere hyperbole untethered to reality and no basis to find a true threat."

In retrospect, defendant may regard his utterances as "mere hyperbole untethered to reality," but others, including the victim, disagree. Words that are so unequivocal, unconditional, immediate, and specific as to convey a gravity of purpose and an immediate prospect of execution of a threat do not lose their impact because the speaker, on reflection, thinks better of it. The evidence supports the verdict.

Defendant stated, in court, before Judge Kearney: "Fuck you, too, bitch. You don't know who the fuck this is. This is maniac mother fucking high beams right here. You know your car is going to blow up." Judge Kearney testified she interpreted defendant's statement as a threat against her life. Defendant made the statement of his own volition as bailiffs approached to remove him from the courtroom. Courtroom staff stated defendant was disruptive and out of control during the hearing.

Evidence before the jury also supported the inference that defendant intended his statements as a threat against the judge. Defendant admitted he "flew off the handle" and later apologized for his outburst. Courtroom staff testified defendant jumped from his seat as he made his statement. Bailiffs restrained defendant and removed him from the courtroom.

Finally, defendant argues Judge Kearney was not in fear or sustained fear following the threat. According to defendant, "the judge's action of walking alone to her car and driving home— within an hour or two of Deegan's statements in the courtroom— and thereafter at home being reassured no threat was intended, inarguably show both that she did not seriously take his words as a true threat and that they did not cause her sustained fear."

Defendant's careful parsing of Judge Kearney's language and his gloss on events ignores Judge Kearney's testimony that she indeed did fear that something could happen, that she felt threatened. Subsequently, during cross-examination, defense counsel asked: "Was it a threat to blow your car up, the property damage, or how did you assume that it was . . . a threat against your life as you said a threat against your life, or did you?" Judge Kearney replied: "The thought of getting in my car and it blowing up, that's a threat against my life." Defense Counsel said: "Okay. So that's the way you took it at the time?" Judge Kearney replied: " 'Your car is going to blow up,' that's how I would take it, yes." Contrary to

1 defendant's assertion, Judge Kearney felt threatened by defendant's
words, an apprehension heightened when the bailiff reminded her
2 that defendant, although in custody, had access to a telephone and
the ability to communicate with a potential confederate. Defendant
3 insists that defendant's words and conduct are far less egregious
than certain other cases in which substantial evidence claims were
4 rejected. Perhaps, but that is beside the point. The question is
whether substantial evidence supports the jury's verdict. We answer
5 that question in the affirmative.

6 **Threatening a Judge**

7 Section 76, subdivision (a) sets forth the elements of the crime of
threatening a judge: "Every person who knowingly and willingly
8 threatens the life of, or threatens serious bodily harm to, any …
judge . . . with the specific intent that the statement be taken as a
9 threat, and the apparent ability to carry out that threat by any
means, is guilty of a public offense . . . ."
10
The court provided the following definitions. "A threat may be oral
11 or in writing and it may be implied by a conduct or combination of
statements and conduct when a person making a threat is an
12 incarcerated prisoner with a stated release date. The ability to carry
out that threat includes the ability to do so in the future.
13
"When the person making the threat is an incarcerated prisoner
14 without a stated release date the ability to carry out the threat also
carries the ability [to] do so by the use of bail, change of plea, or
15 some other reasonable means.

16 "Serious bodily injury includes serious physical injury or serious
traumatic condition. Someone who intends that a statement be
17 understood as a threat does not have to actually intend to carry out
the threatened act or threaten to have someone else do so."
18
Defendant reiterates his previous argument by reference and adds
19 that the prosecution "presented no evidence . . . of any indication
Deegan attempted to contact someone on the outside, that there was
20 anyone on the outside who would or could do Deegan's bidding in
this regard, or indeed that Deegan took any action to carry out this
21 so-called threat."

22 However, section 76 does not require that the prosecution prove
that defendant had a confederate ready, willing, and able to carry
23 out his threat. Section 76 requires evidence that defendant had the
apparent ability to carry out the threat because he was likely to be
24 soon released from custody. The evidence revealed defendant
would have been released from custody no later than October 10,
25 2014, providing sufficient evidence of defendant's ability to carry
out his threat.
26
27 Lodged Doc. 8 at 6-10.

28 ////

D.  Objective Reasonableness Under § 2254(d)

The Court of Appeal decided the sufficiency of evidence issue under California law, without reference to Jackson v. Virginia or the Due Process Clause.  However the standard applied by the state court, and its analysis, are entirely consistent with Jackson.  When a state court denies a federal constitutional claim on the merits without discussion, the question under § 2254 remains whether the outcome is objectively unreasonable under clearly established Supreme Court precedent.  Richter, 563 U.S. at 102.  Applying this standard to the state appellate court's implicit rejection of the constitutional dimension of petitioner's claim, no unreasonableness appears.

The Court of Appeal's rulings on matters of state law—including the meaning of the intent requirements under the threat statutes, what degree of fear the victim must experience, and the definition of "ability to carry out a threat"—are unreviewable here.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (federal habeas court is bound by state court's interpretation of state law).[5] The only question is whether, given the state courts' construction of state law, the evidence at trial permitted the inferences necessarily drawn by the jury.  The California Court of Appeal was not merely allowed but required to draw all permissible inferences from the evidence in favor of the prosecution on these points.  See Jackson, 443 U.S. at 319, 326.  Petitioner disagrees with the jury's evaluation of the evidence, but this is far from a case in which "no rational trier of fact could have agreed with the jury."  Cavazos, 565 U.S. at 2.  The undersigned finds nothing objectively unreasonable about the state court's evaluation of the evidence and its sufficiency.

Particularly in light of the "double dose of deference" to the verdict that is required under the Due Process Clause and the AEDPA, Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011), federal habeas relief is unavailable.

////

////

---

[5]  Petitioner does not claim that the threat statutes are themselves unconstitutional on overbreadth or other grounds.  In any event, such a claim would fail for lack of clearly established Supreme Court precedent on point.

II.     Claim Two:  Exclusion of Defense Evidence

A.  Petitioner's Allegations and Pertinent State Court Record

Petitioner claims that his due process right to present a defense was violated by the trial court's exclusion of proffered evidence that he suffered from PTSD and poor impulse control. The following factual summary, the accuracy of which has been confirmed by the undersigned, is adapted from the opinion of the California Court of Appeal:

> Prior to trial, the prosecution filed a motion in limine to exclude evidence regarding defendant's mental health as lacking both foundation and relevance. During in limine proceedings, defense counsel informed the court he intended to present testimony from Peter Kalmar (Kalmar), a marriage and family counselor who had evaluated defendant at the jail. The court reserved ruling on the issue until it could conduct an Evidence Code section 402 hearing.
>
> At the hearing Kalmar testified he had both a bachelor's and a master's degree in psychology and counseling and was a licensed marriage family therapist. In addition to his private practice, Kalmar had provided mental health services to inmates at the county jail for 11 years. Kalmar screened inmates for mental health symptoms, obtaining treatment records and verifying inmates' current medications, providing suicide risk assessments, and coordinating with classification officers for appropriate housing.
>
> Kalmar also engaged in brief cognitive therapy sessions to help inmates cope with being in jail and psychoeducation to help inmates understand various aspects of mental health treatment and how to treat them. He served approximately 3,000 inmates per year, which over the years totaled over 30,000 inmates. Kalmar performed diagnostic impressions, generally not full assessments and diagnostic work; those were performed by psychologists at the jail. Nor did he prescribe or manage inmates' medications; that task was performed by the jail psychiatrist.
>
> Kalmar met defendant through his work at the jail. He kept contemporaneous records of their sessions, which consisted of "SOAPS," or subjective observations, objective observations, assessment, and plan for follow-through. Kalmar was familiar with PTSD, which was one of the diagnostic impressions he had of defendant. They discussed the issue in counseling sessions. Defense counsel offered Kalmar as an expert on PTSD so he could testify about the disorder, his assessment of defendant, and how a person suffering from the condition acts and reacts.
>
> The prosecution requested further voir dire. In addition to his master's degree in psychology, Kalmar had also completed 36 units of continuing education for every two-year renewal of his license. He had a "fair amount" of training in PTSD. Kalmar had not completed an assessment regarding defendant's mental state prior to the incident with Judge Kearney. He had never previously been

called to testify or been qualified as an expert on PTSD.

Kalmar spoke with defendant the day after the incident. They discussed PTSD and Kalmar noted that defendant had made threats in court. He performed a mental status exam to assess whether defendant needed a follow-up referral for treatment. However, the purpose of the exam was not to ascertain defendant's mental state at the time of the incident. Kalmar's assessment was that defendant suffered from PTSD, anxiety, anger, and poor impulse control.

According to Kalmar, PTSD could have been a factor in defendant's behavior in court, but he "didn't really assess what happened in court or go into that." Kalmar testified defendant's behavior could have been related to his PTSD because it fit the pattern of difficulty in controlling emotion and impulse. However, Kalmar confirmed his opinion simply explained the reason for defendant's outburst but did not explain what defendant was thinking or whether he was serious or joking.

Defense counsel continued the direct examination of Kalmar. Kalmar stated he could explain what PTSD is and how someone develops the condition. He testified his assessment of defendant had included a discussion of the circumstances that caused defendant to have PTSD.

The court questioned Kalmar. Kalmar explained that his assessments involved creating diagnostic impressions, reflecting the fluidity of his subject's mental state and the fact that some conditions are only temporary. Kalmar noted defendant's history and relied on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) to help him determine the number of symptoms defendant had that were consistent with PTSD.

Kalmar first determined defendant suffered from PTSD in 2006 and referred him to a psychiatrist. However, defendant's medical record did not contain a psychiatric evaluation, so Kalmar assumed defendant had been released prior to seeing the psychiatrist. Defendant's medical records stated that on July 29, 2014 [six days after the incident], Dr. Baker, the jail psychiatrist, noted defendant suffered from drug abuse and personality issues. Kalmar testified that he and Dr. Baker did not always agree on the diagnosis of a patient. Defense counsel offered Kalmar's testimony to inform the jury that defendant had been diagnosed with PTSD and to explain what the condition is and the psychological impact that certain stresses have on an individual suffering from the condition.

The court heard argument from the prosecution and defense. The prosecution argued there was no causal connection between defendant's condition and his state of mind when he threatened the judge. Defense counsel argued that two experts had diagnosed defendant with PTSD. However, the trial court noted only one expert was present, and he would not be able to testify as to Dr. Baker's diagnosis. Defense counsel replied Kalmar would be able to testify that he relied on Dr. Baker's diagnosis and that the jury

should know that defendant suffered from PTSD and that certain stressors could cause him to lash out.

The court stated it understood defendant's argument but still needed to be convinced Kalmar was an expert on the issue. Defense counsel argued Kalmar diagnosed defendant with PTSD and Dr. Baker confirmed the diagnosis. Defense counsel noted defendant's homelessness was one of the stressors that caused him to lash out. The PTSD testimony would help explain why defendant lashed out at the judge, aiding the jury in evaluating "the person . . . to make the assessment as to whether or not [his threat] was intentional." Defense counsel concluded that Kalmar had the education, professional license, and experience to explain the issues to the jury.

The prosecution reiterated that Kalmar lacked the qualifications or expertise to form an opinion on how PTSD related to defendant's intent when he threatened the judge, the issue central to the case. In addition, Kalmar's proposed testimony was intended to evoke sympathy from the jury, but there was no connection between PTSD and defendant's intent. In response, defense counsel argued that Kalmar's testimony was not being offered to testify about defendant's intent, but because he suffered from PTSD, the jury should be informed to enable them to decide whether defendant formed the requisite intent.

The court tentatively ruled that it was inclined to exclude the testimony because although Kalmar was qualified to diagnose defendant with PTSD, he was not qualified to testify about how the diagnosis explained defendant's actions or intent at the time of the incident. Defense counsel filed a motion for reconsideration, arguing case law permitted expert testimony that a defendant suffers from a particular mental disease or disorder. In response, the prosecution argued defendant failed to show how the PTSD evidence was relevant to the issue of defendant's intent: "The only question is did he intend to make the threat, not why he intended to make the threat, which is the PTSD . . . ."

Defense counsel explained the testimony would explain the effect PTSD had on defendant's ability to control his actions and whether he "flew off the handle without thinking." In addition, Kalmar would not be asked to form an opinion as to whether defendant had the specific intent at the time.

The court again expressed reservations about Kalmar's qualifications but ruled the evidence would be excluded because it would lead to confusion and uncertainty among the jury. Kalmar did not "treat anybody" but provided counseling and performed intake assessments. According to the court, Kalmar "might be able to do an assessment and say so-and-so has PTSD, but as far as taking it to the next step, that's why I'm at foul here."

In response, defense counsel stated he expected Kalmar to testify about his educational background and explain the process of performing assessments before referring the patient to a psychiatrist

who then would conduct a diagnostic evaluation. Kalmar would also testify that he counseled patients so they knew how to cope with their conditions to prevent outbursts. Defense counsel explained Kalmar "has the qualifications to make that diagnosis. And the fact that he diagnosed [defendant] with PTSD as well as [the] psychiatrist that backed his diagnosis up [shows he] knows what he's talking about and he can describe to the jury what that condition is and how people react under certain stressors."

The court affirmed its tentative ruling and excluded Kalmar's testimony.

Lodged Doc. 8 at 11-15.

### B.  The Clearly Established Federal Law

In general, rulings on the admissibility of evidence are matters of state law and therefore cannot support federal habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67 (1991).  An erroneous evidentiary ruling violates due process only when it results in the denial of a fundamentally fair trial.  Id. at 72.

The Constitution separately guarantees to criminal defendants the right to present a defense.  Chambers v. Mississippi, 410 U.S. 284 (1973); Crane v. Kentucky, 476 U.S. 683, 690 (1986).  "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," such as evidentiary and procedural rules.  United States v. Scheffer, 523 U.S. 303 (1998); see also Chambers, 410 U.S. at 302 (in exercising the right to present a defense, accused must "comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.").  State rules limiting the admissibility of defense evidence are constitutionally permissible as long as they are rationally related to the legitimate purpose of excluding evidence that has only a weak logical connection to the central issues at trial.  Holmes v. South Carolina, 547 U.S. 319, 326-330 (2006) (regarding third-party culpability evidence).

### C.  The State Court's Ruling

This claim was raised on appeal, and so the state appellate court's opinion is subject to review here.  Ortiz, 704 F.3d at 1034.  The Court of Appeal ruled in relevant part as follows:

A person with special knowledge, skill, experience, training, or education in a particular field may qualify as an expert witness at trial. (Evid. Code, § 720.)  However, an expert may offer his or her

15

opinion only if it is related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a).)

The trial court possesses wide discretion to admit or exclude expert testimony. (<u>People v. Curl</u> (2009) 46 Cal.4th 339, 359.) We will not reverse the trial court's ruling on expert testimony unless we find a manifest abuse of discretion. (<u>People v. Lee</u> (2011) 51 Cal.4th 620, 643.)

In addition, a trial court possesses broad discretion to exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, or confusing the issues, or of misleading the jury. (Evid. Code, § 352.)

Defendant argues the court abused its discretion in finding that Kalmar was not qualified to render an opinion on the connection between PTSD and the issues in this case. "There is nothing in this record to support a finding that Kalmar was unqualified to explain how PTSD in a person suffering chronic stress, burdened with additional situational stress, could affect the elements of intent and willfulness at issue in the charged offenses." Defendant also challenges the court's finding that Kalmar's testimony would confuse the jury.

The trial court held a thorough hearing on Kalmar's background and credentials, heard extensive argument, and allowed both parties to present their viewpoints. Although the court expressed reservations about Kalmar's qualifications, it did not, as defendant asserts, exclude the evidence because Kalmar lacked a medical degree. The court found Kalmar qualified to diagnose defendant with PTSD but was not satisfied that Kalmar was qualified to explain how the condition affected defendant's actions and intent when he threatened Judge Kearney.

We find no abuse of discretion in the court's determination. Kalmar never evaluated defendant to determine his mental state following the incident or to provide an assessment of defendant's behavior before Judge Kearney. Nor did Kalmar offer a specific opinion as to how defendant's PTSD might have been a factor in the incident. On appeal, defendant contends Kalmar could have testified "that angry outbursts are a manifestation of the hyperarousal state that is a hallmark of PTSD." However, defense counsel did not offer Kalmar's testimony for this purpose in the trial court. Instead, defense counsel offered Kalmar's testimony as to defendant's PTSD diagnosis but left it up to the jury to determine how it impacted his behavior during the incident. The court properly excluded Kalmar's testimony.

Lodged Doc. 8 at 15-16.

////

16

1          D.  Objective Reasonableness Under § 2254(d)

2          As with the previous claim, the California Court of Appeal resolved this issue as a matter

3    of state law.  Construed as an implicit rejection on the merits of petitioner's due process claim,

4    the opinion is not objectively unreasonable.  See Richter, 563 U.S. at 102.

5          Relevance-based restrictions on expert testimony are precisely the type of evidentiary

6    standard that may legitimately limit the presentation of defense evidence.  See Chambers, 410

7    U.S. at 302.  The state court accurately characterized the proffered testimony of Dr. Kalmar and

8    reasonably found that the trial court had not abused its discretion in failing to admit it.  The

9    distinction between testimony that a defendant suffers from a mental condition and testimony

10   about how a mental condition affects behavior is significant.  Dr. Kalmar had not been retained

11   (or otherwise assigned) to conduct a forensic mental health evaluation focused on the mens rea

12   elements of the charged offenses, and therefore he could not offer an opinion on that issue.  The

13   limited scope of his evaluation made his value as a defense witness marginal at best, and therefore

14   the trial court's exercise of direction was well within permissible bounds.

15         In light of the record as a whole, the exclusion of Dr. Kalmar's testimony did not render

16   the trial fundamentally unfair.  See Estelle, 502 U.S. at 72.  Defense counsel effectively

17   established on cross-examination that petitioner had reason to feel his rights were being denied

18   and that Judge Kearney came to feel petitioner had merely been having a bad day when he

19   mouthed off.  The jury had the opportunity to consider whether petitioner's outburst was merely

20   an expression of frustration rather than a true threat.  See RT 267-283 (defense closing argument).

21   Dr. Kalmar's testimony would have added little to the defense case.  The appellate court's

22   affirmance of the ruling therefore cannot be considered objectively unreasonable.

23                                          CONCLUSION

24         For all the reasons explained above, the state courts' denial of petitioner's claims was not

25   objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS

26   HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

27         These findings and recommendations are submitted to the United States District Judge

28   assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

1    after being served with these findings and recommendations, any party may file written

2    objections with the court and serve a copy on all parties.  Such a document should be captioned

3    "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

4    he shall also address whether a certificate of appealability should issue and, if so, why and as to

5    which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

6    within fourteen days after service of the objections.  The parties are advised that failure to file

7    objections within the specified time may waive the right to appeal the District Court's order.

8    Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9    DATED: August 29, 2022

10

11                                                ALLISON CLAIRE
                                                UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28